# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHEN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **DIANA DURRAH,** | : | Case No. 1:11-CV-02622 |
| Plaintiff, | : | |
| vs. | : | |
| **COMMISSIONER OF SOCIAL SECURITY,** | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |

### I. INTRODUCTION.

Plaintiff seeks judicial review of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). Pending are the cross-Briefs of the parties (Docket Nos. 12 & 13). For the reasons set forth below, the undersigned Magistrate Judge affirms the Commissioner's decision to deny Plaintiff DIB benefits.

### II. PROCEDURAL BACKGROUND.

On September 22, 2009, Plaintiff filed an application for DIB, alleging that she became unable to work because of her disabling condition on January 15, 2008 (Docket No. 10, pp. 108-110 of 325). The application for DIB was denied initially and upon reconsideration (Docket No. 10, pp. 58-60, 62-64 of 325). On May 12, 2011, an administrative hearing was conducted before an Administrative Law Judge (ALJ), Patrick J. Rhoa. On June 2, 2011, the ALJ rendered a decision

and concluded that Plaintiff was not entitled to a period of disability and DIB (Docket No. 10, pp. 12-18 of 325). On October 17, 2011, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's determination the final decision of the Commissioner (Docket No. 10, pp. 4-6 of 325). Plaintiff filed a timely Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).

### III. FACTUAL BACKGROUND.

Plaintiff and the Vocational Expert appeared and testified at the administrative hearing before ALJ Rhoa.

**1. PLAINTIFF'S TESTIMONY.**

**A. DEMOGRAPHIC PROFILE.** Plaintiff, a right-hander, was 56 years of age, was 5'3" tall and she weighed 190 pounds. Plaintiff had an Associate's Degree in Marketing and was pursuing an Associate's Degree in Interior Design at Cuyahoga Community College. Plaintiff had an unrestricted driver's license and was able to drive. Until the preceding May, Plaintiff's income had been unemployment compensation. Plaintiff received food stamps but had no medical coverage. Plaintiff and her 39-year-old daughter lived in a home that was subject to foreclosure. Her daughter assisted with payment of the utilities (Docket No. 10, pp. 25, 27, 28, 40, 43 of 325).

**B. EMPLOYMENT HISTORY.** In August or October 2010, Plaintiff was employed for a period of two months as a part-time customer service representative in an outbound call center. Earning $8 per hour, Plaintiff used web and mobile-based technologies to conduct telemarketing (Docket No. 10, pp. 30, 31 of 325).

From December 2000 through January 2008, Plaintiff was employed on a full-time basis at the AT&T Company (AT&T). As an inbound call center service representative, she sold products

including local and long distance telephone services, internet services, digital subscriber lines and DISH® Network services. Plaintiff was discharged for performance deficiencies (Docket No. 10, pp. 31, 32 of 325).

Plaintiff was employed at Progressive Insurance in 2000, as a sales representative. She used social media to perform her duties (Docket No. 10, p. 34 of 325).

From 1989 to 1999, Plaintiff was an administrative assistant to a vice president at Key Bank. Her duties included typing and copying (Docket No. 10, p. 35 of 325).

    **C.**    **TREATMENT**– Dr. John Schaefer performed surgery on Plaintiff's hands; however, her hands never reached their optimal healing capacity. The right hand remained tender and healing of the left-hand incision was prolonged. In December 2007, Plaintiff discovered that she had arthritis in both hands. The pain and edema were exacerbated by the presence of carpal tunnel syndrome (Docket No. 10, pp. 37, 38 of 325).

Commencing in 2010, Plaintiff was treated by Dr. Ali D. Askari for her hand pain and swelling. Initially, Dr. Askari prescribed Celebrex®, a non-steroidal anti-inflammatory analgesic. Because of gastrointestinal risks, this prescription was replaced by another non-steroidal anti-inflammatory drug, Aleve, which dulled the pain and did not agitate or irritate Plaintiff's gastrointestinal system (Docket No. 10, pp. 36, 39 of 325; PHYSICIAN'S DESK REFERENCE, 2006 WL 389819 (Thomson Reuters 2012)).

Approximately one year prior to the hearing, Plaintiff was treated by Dr. Matthew Marks who recommended that Plaintiff take over-the-counter Nexium®, a compound that inhibits gastric acid secretion (Docket No. 10, p. 38 of 325; PHYSICIANS' DESK REFERENCE, 2006 WL 355252 (Thomson Reuters 2012)).

Cortisone shots were administered to Plaintiff's shoulder in 2006 or 2007. The shots were effective for six months (Docket No. 10, p. 42 of 325).

Plaintiff recalled that the last time she was treated for her back discomfort was while working for AT&T (Docket No. 10, p. 41 of 325).

    **D.**    **FUNCTIONAL LIMITATIONS**--When asked about what tasks she could still perform, Plaintiff explained that her functionality was affected when wearing her braces. Accordingly, she used a Swiffer® to assist with dusting and a steam mop to clear her floors. She could not lift heavy items and relied on her daughter to assist her with lifting the laundry. She could neither sit nor stand for long periods of times and she had to be cautious when driving (Docket No. 10, pp. 41, 42, 43 of 325).

    **E**.    **WHY SHE COULDN'T WORK.** Plaintiff gave several examples of impairments and/or symptoms that interfered with her ability to work. First, she had to wear braces which proved cumbersome when using the computer particularly when the metal in the brace rubbed against any components of the computer. Second, the onset of bronchitis interfered with her ability to communicate. Third, after bilateral hand surgery in 2007, Plaintiff was unable to maintain her job at AT&T because of her inability to meet her sales quotas even with an accommodation (Docket No. 10, pp. 31, 32, 33, 44-45 of 325). Fourth, while working at Progressive, Plaintiff had difficulty performing her duties because of numbness and tingling in her hands (Docket No. 10, p. 34 of 325). Fifth, while working at Key Bank, Plaintiff experienced numbness and cyanosis in her fingers when working at the keyboard (Docket No. 10, p. 35 of 325). Sixth, Plaintiff was involved in two accidents during which she suffered a "bad rotator cuff" injury to the right shoulder and injured her back (Docket No. 10, p. 41 of 325). Seventh, the numbness and reduced strength in Plaintiff's

fingers and/or hands precluded grasping, picking up, manipulating, lifting or holding objects (Docket No. 10, pp. 42, 45, 47 of 325). Eighth, Plaintiff could only work for four hours during an eight-hour workday using a computer (Docket No. 10, p. 46 of 325). Ninth, Plaintiff could not write with her braces. Tenth, Plaintiff could only write for ten minutes without her braces (Docket No. 10, p. 48 of 325).

**2. THE VE'S TESTIMONY.**

First the VE categorized Plaintiff's past relevant work within the relevant period of time, as performed and as generally performed in the national economy, the physical exertional levels for each job and specific vocational preparation or the amount of time required for a typical worker to learn the techniques of the job:

| JOB | PHYSICAL EXERTION | SVP |
| --- | --- | --- |
| ADMINISTRATIVE ASSISTANT | SEDENTARY WORK INVOLVES LIFTING NO MORE THAN TEN POUNDS AT A TIME AND OCCASIONALLY LIFTING OR CARRYING ARTICLES LIKE DOCKET FILES AND SMALL TOOLS. . . . IF WALKING AND STANDING ARE REQUIRED, ONLY OCCASIONALLY. | MORE THAN TWO YEARS AND UP TO FOUR YEARS. |
| DEPARTMENT STORE CLERK | LIGHT WORK INVOLVES LIFTING NO MORE THAN TWENTY POUNDS AT A TIME WITH FREQUENT LIFTING OR CARRYING OF OBJECTS WEIGHING UP TO TEN POUNDS. | MORE THAN ONE MONTH AND UP TO AND INCLUDING THREE MONTHS. |
| CUSTOMER SERVICE REP. | SEDENTARY | MORE THAN SIX MONTHS AND UP TO AND INCLUDING ONE YEAR. |

The ALJ asked the VE to assume an obese individual that had the same age, education and work experience as Plaintiff; that could perform light work with no climbing of ladders, ropes or scaffolds; that could engage in no more than occasional climbing of ramps or stairs, no hazards, no work at unprotected heights; and that had the ability to frequently finger and feel bilaterally. The VE opined that this individual could perform all of Plaintiff's past relevant work (Docket No. 10,

p. 50 of 325). Furthermore, there were other jobs available in the economic community that the hypothetical individual could perform at the light exertional level. The jobs described in the Dictionary of Occupational Titles (DOT), a compilation by occupational analysts of significant occupational definitions, the number of jobs that are available in the local, Ohio and national economies and the SVP are categorized as follows:

| JOBS IN DOT | NUMBER OF JOBS LOCALLY, IN OHIO AND NATIONALLY | SVP |
|---|---|---|
| MAIL CLERK DOT 209687026 | 500/6,000/160,000 | ANYTHING BEYOND A SHORT DEMONSTRATION UP TO AND INCLUDING ONE MONTH |
| FOOD SERVICE WORKER DOT 311677010 | 600/5,000/130,000 | ANYTHING BEYOND A SHORT DEMONSTRATION UP TO AND INCLUDING ONE MONTH |
| PRODUCTION ASSEMBLER DOT 211462010 | 1,000/15,000/300,000 | ANYTHING BEYOND A SHORT DEMONSTRATION UP TO AND INCLUDING ONE MONTH |

(Docket No. 10, p. 51 of 325; www.onetonline.org/help/online/svp; www.occupationalinfo.org).

Next, the ALJ requested that the VE consider the same limitations but change the fingering and feeling to just occasional fingering and feeling bilaterally. The VE responded that the mail clerk and cashier jobs would be excluded from the pool of possible employment. The sales clerk would be the only possible job that could be done. Plaintiff could perform other light level work that required a level of SVP that was beyond a short demonstration up to an including one month as follows:

| Housekeeping cleaner--DOT 323687014 | 2,000 locally, 30,000 in Ohio and 500,000 nationally |
|---|---|
| Laundry folder--DOT 36987018 | 300 locally, 5,000 in Ohio and 60,000 nationally |

In response to counsel's inquiry, the VE further testified that if all of the limitations were maintained but just change the requirement to an accommodation of less than occasional fingering and feeling bilaterally and occasional overhead lifting, Plaintiff could not do any of her past relevant

6

work (Docket No. 10, pp. 51, 52 of 325).

### III. MEDICAL EVIDENCE.

Under the Title II program, medical evidence is the cornerstone for the determination of disability. Each person who files a disability claim is responsible for providing medical evidence showing that he or she has an impairment and the severity of that impairment. 20 C. F. R. § 404.1512(c) (Thomson Reuters 2012). The medical evidence generally comes from sources that have treated or evaluated the claimant for his or her impairment. 20 C. F. R. § 404.1512(b) (Thomson Reuters 2012). The following is a review of the sources that have treated and/or evaluated Plaintiff.

**A.  CARPAL TUNNEL SYNDROME.**

While employed at AT&T, Plaintiff complained of pain and weakness in her hands. Plaintiff filed a claim with the Bureau of Workers Compensation Bureau alleging that the neurological deficit was the result of occupational-related activities.

DR. MATTHEW MARK, M. D., a family practitioner, performed these services:

- On April 27, 2007, he diagnosed Plaintiff with bilateral carpal tunnel syndrome, giving her wrist splints and anti-inflammatory medications and prescribing rest.
- On or about March 7, 2008, he ordered a clinical presentation of Plaintiff's range of motion in the rotator cuff of the right shoulder. Pursuant to Dr. Mark's order, a physical therapist, Kevin Todd Lesoer, created a plan to improve her range of motion and decrease her pain.

(Docket No. 10, pp. 218, 272 of 325; www.healthgrades.com/physician/dr-matthew-mark-29jsq).

DR. DEAN W. ERICKSON, M.D., M.P.H, an internal medicine specialist, performed two independent evaluations based on the medical records and determined:

- On May 4, 2007, Plaintiff had bilateral carpal tunnel syndrome status post decompensation with good clinical results and excellent technical results. Dr. Erickson opined that Plaintiff's work activities were not of the nature, intensity and/or duration

    that one would associate with occupational carpal tunnel syndrome.
- On February 2, 2009, upon submission of additional medical records which now included the presence of mild to moderate two-vessel heart disease, Dr. Erickson determined that the diagnoses and prognosis of Plaintiff's bilateral carpal tunnel syndrome were unchanged; however, he expressed concern about the added risk of Plaintiff's hormone therapy

(Docket No. 10, p. 224-231, 246, 250-257 of 325; www.healthgrades.com/physician/dr-dean-erickson-23hlc).

DR. JOHN W. SHAFFER, M. D., a hand surgeon, diagnosed, treated and performed surgery for purposes of resolving the symptoms associated with bilateral carpal tunnel syndrome. He performed the following therapies to remedy this health problem:

- On May 4, 2007, he confirmed with a nerve conduction study that Plaintiff had carpal tunnel syndrome involving both hands was abnormal. The results were consistent with mild bilateral median neuropathy across the wrists, slightly worse on the right.
- On May 14, 2007 and June 11, 2007, he performed left carpal tunnel release surgery. After each surgery, Plaintiff's left hand/wrist was immobilized with a plaster splint.
- On June 26, 2007, he noted that Plaintiff was recovering nicely following "staged carpal tunnel decompression" and released her to return to work on July 9, 2007.
- On August 7, 2007, he referred her to hand therapy for a work station evaluation and recommendations that Plaintiff could pass on with her employer.
- On September 25, 2007, he planned to refer Plaintiff for a nerve conduction study.
- On January 22, 2008, he noted that the tingling symptoms that were present prior to the carpal tunnel surgery persisted although decreased in severity. Her status was documented and no mediation was prescribed.
- On September 23, 2008, he referred Plaintiff to an occupational physician (Dr. Scott L. Massien) because the carpal tunnel decompression surgery did not enable her to achieve maximum benefits so that work issues would no longer be a factor and suspicions that the poorly defined symptoms in her hands were suggestive of either residual resistant carpal tunnel syndrome, fibromyalgia or other chronic pain issues.

(Docket No. 10, pp. 194, 195, 196, 197, 198, 200, 204, 205, 207-208, 209, 210, 211, 212, 262-265, 266 of 325; www.healthgrades.com/physician/dr-john-shaffer-2tvr6).

DR. SCOTT L. MASSIEN, M. D., an occupational specialist, noted that Plaintiff was still symptomatic on October 20, 2008. He ordered twelve visits of physical therapy for her hands and started her on Celebrex® to avoid further interference with treatment for gastroesophageal reflux

8

disease (Docket No. 10, p. 260 of 325; www.healthgrades.com/physician/dr-scott-massien-xfhg6).

  DR. KIMBERLY TOGLIATTI-TRICKETT, M. D, a consultative examiner, found:

- On October 27, 2009, Plaintiff could move to its full potential, her cervical spine, shoulders, elbows, wrists, hands/fingers, dorsolumbar spine, hips, knees and ankles. Plaintiff could raise her shoulders, elbows, wrists, fingers, hips, knees, feet and great toes. Plaintiff's ability to grasp, manipulate, pinch and use fine coordination was normal on the right but abnormal on the left.
- On October 27, 2009, Plaintiff was diagnosed with obesity, not otherwise specified, allergic rhinitis and carpal tunnel syndrome. Based solely on the physical examination and history as of this date, Dr. Togliatti-Trickett opined that Plaintiff could stand and walk for at least four to six hours at a time, sit without problem and lift and carry objects weighing up to 40 pounds, occasionally, without difficulty.
- On October 27, 2009, the results from the radiologic examination of Plaintiff's wrists showed no evidence of acute fracture. In fact, the results showed normal left and right wrists.
- In an undated report dated May 12, 2010, Dr. Togliatti-Trickett reiterated that Plaintiff's ability to grasp, manipulate, pinch and use fine coordination was abnormal on the right. However, her assessment of Plaintiff's range of motion in her shoulder and dorsolumbar spine was abnormal. Dr. Togliatti-Trickett updated her evaluation based on the development of arthritis in Plaintiff's shoulders and back. The diagnoses remained the same except that she added shoulder sprain/strain and rheumatoid arthritis. The limitations based on the history and examination resulted in an opinion that Plaintiff could stand and walk for at least four to six hours at a time, there was no problem sitting and Plaintiff could lift and carry objects up to 20-30 pounds on occasion, without difficulty. This report was affirmed by Dr. Edmond Gardner, M.D., on May 31, 2010 (Docket No. 10, pp. 276-279, 280-282, 284, 285, 295-298, 299-301 of 325).

**B. VIRAL INFECTIOUS DISEASE**

On October 8, 2009, Plaintiff had sustained a cough for about three weeks. She was diagnosed with a respiratory disease and prescribed drug therapy (Docket No. 10, p. 270 of 325).

**C. PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT.**

DR. GERALD KLYOP, M. D., conducted a consultative examination on December 17, 2009. He found that Plaintiff had the following exertional limitations:

- Occasionally lift and/or carry 20 pounds;
- Frequently lift and/or carry 10 pounds;
- Stand and/or walk with normal breaks for a total of about six hours in an 8-hour

       workday;
- Sit with normal breaks for a total of about six hours in an 8-hour workday;
- Push and/or pull (including the operation of hand and/or foot controls) on an unlimited basis.

Dr. Klyop suggested that Plaintiff could never climb using a ladder/rope/scaffold; she was limited in her ability to handle and finger but unlimited in her ability to reach in all directions and feel. Plaintiff had no environmental, communicative or visual limitations (Docket No. 10, pp. 286-293 of 325).

**D.  ARTHRITIS**

Plaintiff presented to DR. ALI ASKARI, the Chief and Director of Medicine in the Division of Rheumatology at University Hospitals Case Medical Center, pursuant to a referral on or about May 27, 2010. An initial evaluation of poly-arthralgias which seemed consistent with generalized degenerative arthritis was performed. Plaintiff declined an injection to assist with the symptoms related to the complaints of shoulder, joint, knee and back pain. However, she accepted a right wrist splint with the thumb cast to immobilize the area (Docket No. 10, pp. 324-325 of 325).

On June 9, 2010, several tests were performed, the results of which showed, notably:

- The hormone made by the parathyroid glands that was critical to maintaining calcium and phosphorous balance was intact.
- The glucose levels were elevated.
- The sodium levels were lower than the normal reference range.
- The rheumatoid factor exceeded the normal reference range.
- Plaintiff showed a high sensitivity to the risk factors for cardiovascular disease.
- The levels of thyroid-stimulating hormone were within the normal reference range (Docket No. 10, pp. 309-315 of 325).

On July 9, 2010, Plaintiff presented with generalized back and shoulder stiffness and thumb swelling. The results from the diagnostic tests:

- The lumbar spine films showed trace displacement of the vertebra over the lower segment at L4 over L5.

- The right-hand films showed no lesion, fracture, spur, erosion or new bone formation.
- The left-hand films were negative for abnormality, showing no destructive bone lesion, fracture, mal-alignment, erosive or hypertrophic arthritic change.
- The right shoulder films showed mild to moderate degenerative joint disease.

Plaintiff had stopped taking Celebrex® because it irritated her stomach so Dr. Askari prescribed another anti-inflammatory agent (Docket No. 10, pp. 304-308 of 325).

### IV. LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB is available only for those who have a "disability." *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires. *Key v. Callahan*, 109 F. 2d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*  Third, if plaintiff is not performing

11

substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.* Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.* For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V. THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings:

1. At step one, Plaintiff met the insured status requirements of the Act through December 31, 2013. Plaintiff had not engaged in substantial gainful activity since March 22, 2009, the alleged onset date of disability (20 C.F.R. §§ 404.1520(b) and 404.1571).

2. At step two, Plaintiff had severe impairments: carpal tunnel syndrome and obesity.

3. At step three, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. At step four the ALJ considered that Plaintiff had the residual functional capacity to perform light work except that she cannot climb ladders, ropes, or scaffolds, or work around hazards such as unprotected heights. Plaintiff can only occasionally climb ramps and stairs and occasionally perform fingering and feeling bilaterally.

5. At step five, the ALJ found that Plaintiff was capable of performing her past relevant work as a department store clerk. This work did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

      6. In conclusion, Plaintiff was not under a disability, as defined in the Act, through March 31, 2009, the date last insured.

(Docket No. 10, pp. 12-18 of 325).

### V. STANDARD FOR REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*. *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011). Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings. *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)). "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).

The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id*. at 740-741. To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Further, a district court must not focus, or base its decision, on a single piece of evidence. Instead, a court must consider the totality of the evidence on record. *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)). In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen*

*v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)). Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)). However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

### V. PLAINTIFF'S CLAIM.

Plaintiff seeks reversal and an award of benefits for the sole reason that the ALJ's finding of her residual functional capacity assessment was not an accurate reflection of her limitations arising from severe carpal tunnel syndrome.

### VI. DEFENDANT'S RESPONSE.

Defendant contends that there is substantial evidence to support the ALJ's residual functional capacity assessment. Consequently, Plaintiff is not entitled to DIB and the Commissioner's decision should be affirmed.

### VII. ANALYSIS.

Upon review of Plaintiff's argument, the Magistrate finds that Plaintiff actually presents two challenges to the limitations imposed by the carpal tunnel syndrome. First, Plaintiff's residual functional capacity fails to accurately reflect her limitations in handling. Second, the opinions of the VE are not based on substantial evidence since the ALJ failed to include the limitation in handling in any of the hypothetical questions.

A. **RESIDUAL FUNCTIONAL CAPACITY.**

A claimant's residual functional capacity is an indication of that individual's work-related abilities despite her limitations.  20 C.F.R. § 404.1545(a)(1) (Thomson Reuters 2012).  A claimant's residual functional capacity is not a medical opinion, but an administrative determination reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2) (Thomson Reuters 2012).  As such, the ALJ bears the responsibility for assessing a claimant's residual functional capacity, based on all of the relevant evidence.  20 C.F.R. § 404.1545(a)(3) (Thomson Reuters 2012).  Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by substantial evidence.  It is well established that the substantial evidence standard presupposes that there is a "zone of choice" within which the Agency may proceed without interference from the courts.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).  The ALJ's decision must be affirmed if it is supported by substantial evidence even if the reviewing court would have decided the matter differently and substantial evidence also supports a different conclusion.  *Id.* (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984)).

Plaintiff's eligibility for benefits hinges on the determination of whether her residual functional capacity corresponded with her testimony of a marked inability to use her hands to handle anything.  The regulations do not make a distinction about what conditions constitute handling. The Webster Dictionary's traditional meaning includes touching, feeling or holding with one's hands. Www.webster-dictionary.net/definition/handle.

In assessing Plaintiff's residual functional capacity, the ALJ appropriately evaluated and accounted for all of Plaintiff's credible limitations in considering what exertional limitations resulted from her neurological impairments.  He referred to Plaintiff's testimony that she could not grasp

things or things fell out of her hand. However, the objective findings revealed minimal functional difficulties resulting from the carpal tunnel syndrome. The ALJ considered Dr. Erickson's findings that Plaintiff had a grip of approximately 50-75% of normal in her right hand and there was no evidence of weakness in her left hand. There was no evidence of atrophy or loss of sensation. Dr. Klyop determined that Plaintiff could have limited handling. The ALJ acknowledged Dr. Togliatti-Trickett's findings that the radiographic examination showed normal left and right wrists and that her ability to grasp, manipulate, pinch and use fine coordination was normal on the right but abnormal on the left. Once Plaintiff was diagnosed with arthritis, Dr. Togliatti-Trickett reassessed her condition and decreased the amount that Plaintiff could occasionally lift to thirty pounds or less.

The ALJ did not accept as true all of the possibilities posed by Plaintiff as the medical evidence did not support Plaintiff's suggestion that she was totally foreclosed from using her hands to "handle" anything. Based on a preponderance of the medical evidence, the ALJ found that Plaintiff had the capacity to "handle," albeit only occasionally by fingering and feeling bilaterally. Since the ALJ followed the rules and his decision is based on substantial evidence, the Commissioner's decision as to this issue is affirmed.

**B.**     **THE HYPOTHETICAL QUESTIONS.**

Plaintiff suggests that the ALJ failed to include in the hypothetical questions the inability to handle as a consequence of her carpal tunnel syndrome.

The logical underpinnings for the requirements that the hypothetical question posed to the VE must include the claimant's impairments are that without an actual depiction of the limitations, the VE will not be able to accurately access whether jobs do exist for the claimant. *Lamtman v. Commissioner of Social Sec*urity, 2012 WL 2921705, *14 (N.D.Ohio,2012). The hypothetical

question posed to a VE for purposes of determining whether a claimant can perform other work should be a complete assessment of the claimant's physical and mental state and should include an accurate portrayal of the claimant's physical and mental impairments. *Id*. (*citing Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir.1987); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir.1975) (per curiam)). The hypothetical question should focus on the claimant's overall state. *Id*. It need not include lists of the claimant's medical conditions. *Id*. at 633. An ALJ is only required to incorporate into the hypothetical question, limitations that he or she accepts as credible. *Petro v. Astrue*, 2009 WL 773283, *4 (E.D.Ky.2009) (*citing Sias v. Secretary of Health and Human Services*, 861 F.2d 475, 480 (6th Cir. 1988)).

      Here, the premise of Plaintiff's argument is mistaken because the ALJ properly accounted for Plaintiff's physical limitations that he found to exist on the record, which is all he was bound to do. The ALJ posed the controlling hypothetical question to the VE that incorporated "handling." Specifically, the ALJ asked the VE to consider Plaintiff's ability to "handle" when he asked the VE to consider a hypothetical that included occasional fingering and feeling bilaterally and just occasional overhead lifting. Plaintiff's counsel asked the VE to consider Plaintiff's ability to "handle" in performing her past relevant work and then stopped the questioning, refusing to infuse the same limitations in a hypothetical question about the ability to engage in other work. It appears clear that Plaintiff has failed to show that the ALJ's hypothetical was an inaccurate representation of Plaintiff's functional limitations.

      Making a final effort to obtain benefits, Plaintiff argued that the VE was asked in a hypothetical to assume an individual who would be limited to occasional handling and fingering. Assuming that the response elicited in this alternate hypothetical accurately sets forth Plaintiff's

17

physical limitations, the VE concluded that such individual would not be able to perform Plaintiff's past relevant work.  The argument that Plaintiff's inability to handle precluded her from performing past relevant work is unavailing because the VE's narrowly tailored response focused solely on Plaintiff's past relevant work at step four of the sequential evaluation.  Plaintiff totally ignores the fact that at step five of the sequential evaluation, even with the limitations on handling, the VE opined that Plaintiff could perform work as a housekeeper cleaner, mail clerk, food service worker, production assembly worker and laundry folder provided she "handled" occasionally.

## VIII.  CONCLUSION

For these reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  November 29, 2012